

1  Donald R. Warren, C.B. No. 138933
   Phillip E. Benson, C.B. No. 97420
2  Warren ▪ Benson Law Group
   7825 Fay Ave., Suite 200
3  La Jolla, CA 92037
   Telephone: (858) 454-2877
4  Facsimile: (858) 454-5878

5  Attorneys for *Qui Tam* Plaintiff
6

7

8           **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA**

10                 **WESTERN DIVISION**

11

12  UNITED STATES OF AMERICA ) CASE NO.
    ex rel James Dibdin, M.D.,  )
13                              )
        Plaintiffs,             ) COMPLAINT FOR VIOLATION OF
14                              ) THE FEDERAL FALSE CLAIMS ACT
    v.                          )
15                              ) [31 U.S.C. § 3729 *et seq.*]
    MEDI-LAB CORPORATION,       )
16  LFPS, INC., POGOSYAN        )
    CORPORATION, KHACHATUR      )
17  POGOSYAN, FELIX KOLTSOV,    ) JURY TRIAL DEMANDED
    DAVIN DEB, and VARDOUHI     )
18  ACHABANIAN,                 )
                                )
19      Defendants              ) **LODGED UNDER SEAL PURSUANT**
                                ) **TO 31 U.S.C. §§ 3730(b)(2) and (3)]**
20

21

22      *Qui Tam* Plaintiff James Dibdin, M.D., suing for himself and for the United

23  States, alleges as follows:

24                      **I. NATURE OF ACTION**

25

26      1.      James Dibdin, M.D. ("Dr. Dibdin"), on behalf of the United States,

27  brings this action to recover treble damages and civil penalties from false claims

28                              1

_____
                                        *Qui Tam* Plaintiff's Complaint

submitted to the Medicare program as a result of the conduct of the defendants Medi-Lab Corporation, LFPS, Inc., Pogosyan Corporation, Khachatur Pogosyan, Felix Koltsov, Davin Deb and Vardouhi Achabanian (collectively "Defendants").

2.     The defendants Medi-Lab Corporation and LFPS, Inc. operate as clinical toxicology laboratories which conduct drug screening tests on urine samples.  These labs perform drug testing to identify classes of drugs present in the samples, such as opiates, amphetamines and anti-depressants.  This is called "qualitative" testing or "screening".  If any of these classes of drugs is detected, then an additional test of the specific class needs to be performed to determine the exact drug within the class that returned a "positive" result. This is called "quantitative" or "confirmation" testing.

3.     The labs should only bill for the specific "confirmation" testing for the class of drugs that gave an initial "positive" result in the "qualitative" test, or for the specific class of drugs where a "negative" result is inconsistent with the patient's stated condition.  However, these defendants instead automatically perform and bill for follow up "confirmation" testing on multiple classes of drugs, regardless of the outcome of the "qualitative" screen.  The defendants then bill Medicare for approximately 42 to 55 individual "confirmation" tests even though all, or almost all, of the classes of drugs were not present in the urine sample.  For each urine sample, this results in a billing to Medicare averaging more than

$1,500 for "confirmation" testing, when only a very small fraction of that amount

is appropriate.

4.    The defendants' inflated billings to Medicare amount to tens of

millions of dollars each year, and has been occurring since at least 2010.

## II. JURISDICTION AND VENUE

5.    The Court has subject matter jurisdiction to entertain this action

under 28 U.S.C. §§ 1331 and 1345.  The Court may exercise personal jurisdiction

over the defendants pursuant to 31 U.S.C. § 3732(a).

6.    Venue is proper in the Central District of California under 31 U.S.C.

§ 3732 and 28 U.S.C. **§§** 1391(b) and (c) because the defendants reside in this

District and because the defendants committed acts within this district that

violated 31 U.S.C. § 3729.

## III. PARTIES

7.    *Qui Tam* Plaintiff James Dibdin, M.D., ("Dr. Dibdin") is a Board

Certified Pathologist residing in the Central District of California.  In December

2010, Dr. Dibdin was hired by Medi-Lab Corporation as its lab director to oversee

laboratory testing scientific quality control and ensure compliance with CLIA

(Clinical Laboratory Improvement Amendments) certification and licensing

requirements.  In March 2011, Dr. Dibdin was also hired by LFPS, Inc. as its lab

director to oversee laboratory testing scientific quality control.  Dr. Dibdin

worked as lab director for these entities until he learned in late January 2014 that both labs had been automatically billing for tens of thousands unreimbursable and medically unnecessary "confirmation" tests which were never ordered by a treating physician.  Dr. Dibdin complained of this fraud to both Medi-Lab Corporation and LFPS, Inc., demanded that they correct the billing, and then resigned from his employment on January 31, 2014.

8.     Defendant Medi-Lab Corporation ("Medi-Lab") is a California corporation headquartered in Glendale, California.  Medi-Lab is one of many corporations owned and controlled by defendant Khachatur Pogosyan and his wife, Vardouhi Achabanian.  Medi-Lab operates as a clinical toxicology laboratory in Glendale, performing drug screening tests on urine samples, and acted in conspiracy with the other defendants to submit, or cause to be submitted, the false claims described herein.

9.     Defendant LFPS, Inc. ("LFPS") is a California corporation headquartered in San Bernardino, California.  LFPS is owned and controlled by defendant Felix Koltsov .  LFPS operates as a clinical toxicology laboratory in San Bernardino, performing drug screening tests on urine samples, and acted in conspiracy with the other defendants to submit, or cause to be submitted, the false claims described herein.

10.     Defendant Pogosyan Corporation is a California corporation headquartered in Glendale, California.  Pogosyan Corporation is one of many corporations owned and controlled by defendant Khachatur Pogosyan and his wife, Vardouhi Achabanian.  Pogosyan Corporation is a co-operator of the Medi-Lab clinical toxicology laboratory in Glendale, and acted in conspiracy with the other defendants to submit, or cause to be submitted, the false claims described herein.

11.     Defendant Khachatur Pogosyan, along with his wife Vardouhi Achabanian, owns and controls defendants  and Pogosyan Corporation.  Mr. Pogosyan and Ms. Achabanian directed the conduct of these two corporations and acted in conspiracy with the other defendants to submit, or cause to be submitted, the false claims described herein.  Mr. Pogosyan resides in the Central District of California.

12.     Defendant Felix Koltsov owns and controls defendant LFPS, Inc.  Mr. Koltsov directed the conduct of LFPS, Inc. and acted in conspiracy with the other defendants to submit, or cause to be submitted, the false claims described herein.  Mr. Koltsov resides in the Central District of California.

13.     Defendant Davin Deb is the Director of Operations for defendant Mr. Deb acted in conspiracy with the other defendants to submit, or cause to be

*Qui Tam* Plaintiff's Complaint

submitted, the false claims described herein.  Mr. Deb resides in the Central District of California.

14.     Defendant Vardouhi Achabanian, along with her husband Khachatur Pogosyan, owns and controls defendants  and Pogosyan Corporation.  Ms. Achabanian and Mr. Pogosyan directed the conduct of those two corporations and acted in conspiracy with the other defendants to submit, or cause to be submitted, the false claims described herein.  Ms. Achabanian resides in the Central District of California.

15.     Plaintiff is informed and believes, and thereon alleges, that Defendants, and each and all of them, at all relevant times hereinafter mentioned were the agents, partners, fiduciaries, representatives, and/or co-conspirators of each of the remaining defendants.  Defendants, in doing the things hereinafter alleged, were acting within the course and scope of such relationship and were responsible for the occurrences herein alleged.

16.     Rule 9(b), Fed. R. Civ. P. Allegations.  Much of the documentation necessary to prove the allegations contained herein is in the exclusive possession of the Defendants or the United States.

## IV. The False Claims Act

17.     The FCA provides, in pertinent part, that a person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B)  knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(a)(1)C) conspires to commit a violation of subparagraph (A), (B),...or (G);

(a)(1)(G)  knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains. . . .

31 U.S.C. § 3729   For purposes of the False Claims Act,

the term "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

## V. **The Medicare Program**

18.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of healthcare services for certain individuals. HHS is responsible for the administration and supervision of the Medicare program, which it does through CMS, an agency of HHS.

19.     Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. See 42 U.S.C. §§ 1395c-1395i-4. Part B primarily covers physician and other ancillary services. See 42 U.S.C. § 1395k.

20.     To assist in the administration of claims, CMS contracts Medicare Administrative Contractors ("MACs"). The MACs act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level. See 42 § C.F.R. 421.5(b).

21.     Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to clinical toxicology laboratories for eligible services.

22.     Not surprisingly, in order to prevent waste, fraud and abuse, the Social Security Act, 42 U.S.C. § 1395y(a)(1) states the Medicare Program is only authorized to pay for items and services that are medically "reasonable and necessary."  The Secretary of HHS is authorized to define what services meet that criteria. 42 U.S.C. § 1395ff(a).  Medicaid and other federally funded programs only pay for items and services that are medically "reasonable and necessary."

23.     Medicare providers have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those stated in the Medicare Manuals.

*Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 64-65 (1984).  A provider's failure to inform itself of the legal requirements for participation in the program acts in reckless disregard or deliberate ignorance of those requirements, either of which is sufficient to charge it with knowledge of the falsity of the claims or certifications in question, under the False Claims Act. *United States v. Mackby,* 261 F.3d 821, 828 (9th Cir. 2001).

## VI.  MEDICARE COVERAGE FOR CLINICAL TOXICOLOGY LABS

24.     Part B of the Medicare Program, 42 U.S.C. §§ 1395j - 1395w-5 ("Part B") provides federally-funded "Supplementary medical Insurance Benefits for Aged and Disabled" Medicare beneficiaries.

25.     The Medicare Program expressly does not provide reimbursement "for any expenses incurred for items or services" that "are not reasonable and necessary for the diagnosis or treatment of illness or injury, " 42 U.S.C. § 1395y(a)(1).

26.     This exclusion from coverage is codified in 42 CFR § 410.32:

**§411.15  Particular services excluded from coverage.**
The following services are excluded from coverage:
(k) Any services that are not reasonable and necessary for one of the following purposes:
(1) For the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

9

27.     Clinical lab tests that are not ordered by a treating physician are not reasonable and necessary and are not reimbursable, as codified in 42 CFR § 410.32 :

> **§ 410.32   Diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests: Conditions.**
>
> All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary.... Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary.

This applies to the tens of thousands of unnecessary "confirmation" tests that were never ordered by a physician, but were systematically billed by the defendants herein.

28.     Additional requirements govern the actual submission of claims for payment to Medicare (42 CFR §§ 424.30 - 424.44), which must be filed "by the provider [or] supplier" making the claim to Medicare and, absent express waiver of the requirement by relevant CMS instructions, signed by that provider or supplier.  *id*. § 424.33.

29.     In addition, a provider or supplier seeking payment from Medicare for clinical laboratory services furnished to Part B beneficiaries cannot obtain Medicare reimbursement unless "[t]he Part B items and services" described in the claim were "ordered or referred by a physician or, when permitted, an eligible professional (as defined in [42 CFR] § 424.506(a))."  **42 CFR §§ 424.507(a)(i)**

**Conditions for payment of claims for ordered covered imaging and clinical laboratory services and items of durable medical equipment, prosthetics, orthotics, and supplies (DMEPOS)**.

30.     To obtain reimbursement for "medical and other health services" furnished to Part B beneficiaries, a provider must certify that the services in question "were medically necessary," and such certification "must be signed by a physician, nurse [practitioner], clinical nurse specialist, or physician assistant who has knowledge of the case."  42 CFR §§ 424.24,

## VII. <u>CLINICAL TOXICOLOGY LAB TESTING</u>

31.     A toxicology test examines blood, urine or saliva for the presence of drugs.  Drug toxicology tests are most commonly performed on urine, for reasons that include the fact that most drugs and their breakdown products are excreted in the urine in higher concentrations than in the blood, and because urine toxicology tests are often inexpensive and quick.

32.     Most toxicology tests determine only the presence of classes of drugs (called qualitative testing or screening) in the body and not the specific level or quantity.  Follow-up testing may be required to determine the exact level of a certain drug in the body (called quantitative or confirmation testing).

33.     The basic principle of confirming a positive drug test is to retest the same urine sample with a different type of test that is more sensitive and also

more expensive.  Assuming the initial screen was "medically necessary" in fact, confirmatory tests are appropriate for any class of drugs that gave an initial "positive" result in the "qualitative" test, or for the specific class of drugs where a "negative" result is inconsistent with the patient's stated condition.  Of course, these tests must be ordered by a treating physician if they are to be reimbursable by Medicare.

## VIII.  DEFENDANTS' MISCONDUCT

34.     The defendants Medi-Lab Corporation and LFPS, Inc. operate as clinical toxicology laboratories which conduct drug screening tests on urine samples.  These labs perform initial drug screen testing to identify classes of drugs present in the samples, such as opiates, amphetamines and anti-depressants. This is called "qualitative" testing.  If any of these classes of drugs is detected, then an additional test of the specific class needs to be performed to determine the exact drug within the class that returned a "positive" result. This is called "confirmation" testing.

35.     The labs should only bill for the specific "confirmation" testing for the class of drugs that gave an initial "positive" result in the "qualitative" test, or for the specific class of drugs where a "negative" result is inconsistent with the patient's stated condition, and only when the confirmation is requested by a

treating physician ordering the drug screen, and the drug screen itself is determined to be medically necessary.

36. **Medi Lab, Inc.**  Medi-Lab was formed by Khachatur Pogosyan in April 2010.  Dr. Dibdin was hired by Medi-Lab in December 2010 as Lab Director to oversee the scientific quality control of the lab testing and ensure compliance with CLIA (Clinical Laboratory Improvement Amendments) certification and licensing requirements.  Medi-Lab has always had the capacity to perform both qualitative "screening" tests and also quantitative "confirmation" tests.

37. Medi-Lab's screening test in its "Comprehensive Drug Panel with Illicits" determines whether certain classes of drugs are present in the samples, such as opiates, amphetamines and anti-depressants.  Following this initial screening, Medi-Lab's confirmation test then has the capacity to determine whether any of approximately fifty five specific drugs and metabolites within these classes is present.  The confirmation test result is reported as a "concentration" for the specific drug.

38. Medi-Lab's test order form which is filled in and signed by the ordering physician includes the test panel being ordered, and also states:

CONFIRMATION OF NEGATIVES WILL PROVIDE LOWER CUTOFF TESTING RESULTS AND QUALITY CONTROL FOR POINT-OF-CARE TEST. MEDI-LAB WILL CONFIRM ALL POSITIVE RESULTS AND WILL CONFIRM NEGATIVE RESULTS UPON REQUEST.

39. Medi-Lab's order form also has a box the ordering physician can "check" if he/she wants to order "CONFIRM ALL NEGATIVES". Of course, this box is almost never "checked" by the ordering physician, as it would be a gross waste to confirm all negative results.

40. Immediately below the descriptions noted in the preceding two paragraphs is a chart of the screening test results for fourteen classes of drugs. In almost all instances, only one or two of the classes are marked as having tested positive. Below is an example typical of both the Medi-Lab order form and the LFPS, Inc. order form:

14

| ANALYSIS REQUESTED | | | | |
|---|---|---|---|---|
| ☑ #0415 | COMPREHENSIVE DRUG PANEL W/ILLICITS | | | |
| ☑ #0416 | COMPREHENSIVE DRUG PANEL | | ☐ MEDICARE0415 | |
| ☐ #0417 | ILLICITS ONLY | | ☐ MEDICARE0416 | |
| ☐ # | OTHER | | | |

**POINT OF CARE TEST RESULTS**

CONFIRMATION OF NEGATIVES WILL PROVIDE LOWER CUTOFF TESTING RESULTS AND QUALITY CONTROL FOR POINT-OF-CARE TEST. MEDI-LAB WILL CONFIRM ALL POSITIVE RESULTS AND WILL CONFIRM NEGATIVE RESULTS UPON REQUEST.

☐ CONFIRM ALL NEGATIVES

| | NOT TESTED | POSITIVE | NEGATIVE | CONFIRM NEGATIVE |
|---|---|---|---|---|
| AMP (AMPHETAMINES) | ☐ | ☐ | ☒ | ☐ |
| BAR (BARBITURATES) | ☐ | ☐ | ☒ | ☐ |
| BZO or BZD (BENZODIAZEPINES) | ☐ | ☐ | ☒ | ☐ |
| COC (COCAINE) | ☐ | ☐ | ☒ | ☐ |
| ETOH (ALCOHOL) | ☐ | ☐ | ☒ | ☐ |
| MDMA or XTC (MDMA) | ☐ | ☐ | ☒ | ☐ |
| MTD (METHADONE) | ☐ | ☐ | ☒ | ☐ |
| MET (METHAQALONE) | ☐ | ☐ | ☒ | ☐ |
| OPI, MOP, or MOR (OPIATES) | ☐ | ☐ | ☒ | ☐ |
| OXY (OXYCODONE) | ☐ | ☒ | ☐ | ☐ |
| PCP (PHENCYCLIDINE) | ☐ | ☐ | ☒ | ☐ |
| PROP (PROPOXYPHENE) | ☐ | ☐ | ☒ | ☐ |
| TCA (TRICYCLIC ANTIDEPRESSANTS) | ☐ | ☐ | ☒ | ☐ |
| THC (MARIJUANA) | ☐ | ☐ | ☒ | ☐ |

41.     Medi-Lab has programmed its "confirmation" test equipment so that it always performs an automated all-in-one test which automatically provides test results for dozens of specific drugs, rather than just a panel for only the drugs that were "positive" in the initial screen.  Medi-Lab's typical quantitative report will list at least 40 parent drugs tested for, plus a variable number of their metabolites. However, this does not make all of these "confirmation" tests reimbursable by

15

Medicare or any other type of insurance.  To be reimbursable, the confirmation tests still need to be medically necessary and be ordered by a treating physician. However, to maximize its revenue, Medi-Lab bills Medicare for the entire array of up to fifty five automated "confirmation" tests on every urine sample, including all of the classes of drugs that tested "negative" and for which "confirmation" testing was never ordered by a treating physician.

42.     Medi-Lab Corporation has been submitting these fraudulent billings to Medicare since 2010, and its conduct is continuing.

43.     **LFPS, Inc.**  LFPS, Inc., ("LFPS") is an acronym for Labs for Physicians and Surgeons.  LFPS was formed by Felix Koltsov in January 2011. Upon Mr. Pogosyan's suggestion to Mr. Koltsov, Dr. Dibdin was hired by LFPS in March 2011 as Lab Director to oversee the scientific quality control of the lab testing and ensure compliance with CLIA (Clinical Laboratory Improvement Amendments) certification and licensing requirements.  Until March 2013, LFPS lacked the capacity to perform "confirmation" tests.  It could only perform the initial "screening" tests.  Because Khachatur Pogosyan was helping Mr. Koltsov get involved in and understand the clinical toxicology lab business, LFPS sent all of its "confirmation" testing to Medi-Lab from January 2011 until approximately March 2013.

44.     During this time frame, after performing its own "screening" test, LFPS would send every urine sample to Medi-Lab for "confirmation" testing on not only the drug classes that showed "positive", but also on all drug classes that were "negative".  Medi-Lab would perform the full array of dozens of automated "confirmation" tests for all drug classes and would bill a discounted fee to LFPS for this process.  LFPS would then bill Medicare for the full array of medically unnecessary "confirmation" tests which had never been ordered by a treating physician.

45.     LFPS has always used the same format order form as Medi-Lab for its tests, as described in paragraphs 38 through 40, above.

46.     LFPS purchased its own "confirmation" test equipment in March 2013 and, like Medi-Lab, programmed its "confirmation" test equipment so that it always performs an automated all-in-one test which automatically provides test results for dozens of specific drugs, rather than just a panel for only the drugs that were "positive" in the initial screen.

47.     Beginning in March 2013, LFPS began performing its own "confirmation" tests on every sample, and continued its pattern of false billing for all of these "confirmation" tests as though they were reasonable and necessary and were ordered by the treating physician.  Felix Kotsov had learned the clinical lab business from Khachatur Pogosyan, and was determined to make his own

fortune from billing Medicare and other insurance for unreimbursable "confirmation" testing performed by LFPS.

48.     Although Dr. Dibdin oversaw the scientific quality control of tests for both of the labs and knew the "confirmation" test machines automatically performed an all-in-one test for dozens of specific drugs and metabolites, he had never been involved in either lab's billing and was unaware how the tests were billed or reimbursed by Medicare or other insurance.  Both Medi-Lab and LFPS kept the billing away from Dr. Dibdin and never discussed it with him.  However, in January 2014, Dr. Dibdin heard from LFPS and Medi-Lab that they were having difficulty in getting reimbursed for confirmation tests.  These discussions caused Dr. Dibdin to look into how confirmation tests are reimbursed and he learned these tests are reimbursed on a per-test basis and only for those confirmations which are medically necessary and have been ordered by a treating physician.  Until this point, Dr. Dibdin had been unaware how the billing occurred and had assumed there was some flat rate reimbursement for confirmation testing.

49.     Dr. Dibdin realized both Medi-Lab and LFPS had been committing billing fraud and he immediately confronted the companies and owners with his concerns, demanding that the billing be corrected.  In an email dated January 23, 2014, to Khachatur "Chris" Pogosyan, Dr. Dibdin stated:

Chris:

I need to meet with you to discuss numerous issues regarding this lab.  It now appears that there are issues regarding the volume of business, staffing issues, quality control issues and billing issues - have you been billing based on the theory that each test run quantitates 40 drugs? - Felix says you have - I can assure you that we are not quantitating 40 drugs with each test and you can not bill $1520 per test based on the theory that we are.  Who exactly is running the lab?  Its obviously not me.  I'm totally in the dark."

50.    Mr. Pogosyan responded that he was out of town and could meet the next week.  However, when Mr. Pogosyan did not get back to Dr. Dibdin the next week, Dr. Dibdin resigned from Medi-Lab Corporation and LFPS, Inc. on January 31, 2014.

51.    **Stolen Identity.**   Within a few days after he resigned, Dr. Dibdin was contacted in early February 2014 by State Compensation Insurance Fund ("SCIF") , which is a workers compensation insurance company in California. SCIF contacted Dr. Dibdin with an inquiry about a workers compensation lab test that had been performed by LFPS shortly before he resigned.  Dr. Dibdin asked SCIF to fax the paperwork to him and, when he received it, saw for the first time that his name had been hijacked by LFPS and was being used as the "Provider/Supplier" in box 31 of its form 1500 billing without his authorization to do so.

52.    In July 2014, Dr. Dibdin received a similar workers compensation inquiry related to a Medi-lab form 1500 billing.  The Medi-Lab billing shows that

Medi-Lab also has stolen Dr. Dibdin's identity and has been using his name as the "Provider" in box 31 of its form 1500 billing without his authorization to do so.

53.     Because of the manner in which the two labs operate, Dr. Dibdin is now convinced that his name was used by the labs as the "Provider/Supplier" on their Medicare billings as well and, on that basis, so alleges.  Dr. Dibdin is not a Medicare licensed provider, never saw any billings by either lab, never agreed that his name could be used as the "Provider/Supplier" in any billings by either Medi-Lab or LFPS, and had no prior knowledge that either lab was doing so.  Dr. Dibdin's knowledge of the operation of the Medi-Lab and LFPS laboratories was confined to laboratory processes and quality controls as outlined in CLIA guidelines.

54.     Through their conduct described above, Defendants have knowingly submitted, and caused the submission of, false claims to the United States which have resulted in tens of millions of dollars of reimbursement that would not have been paid but for Defendants' misconduct.  On information and belief, it is alleged this misconduct by Defendants is continuing.

55.     Dr. Dibdin cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct.  The false or fraudulent claims were presented by thousands of separate transactions.  Dr. Dibdin has had no

control over or dealings with Defendants' billings and has no access to the records in their possession.

## IX.  First Cause of Action
### (Violation of the Federal False Claims Act – 31 U.S.C. §§ 3729, *et seq.*)

56.    *Qui Tam* Plaintiff hereby refers to and incorporates by this reference each and every allegation set forth in paragraphs 1 through 55, inclusive.

57.    Through their conduct described above and continuing, the defendants have knowingly submitted or caused to be submitted, false claims for payment, in violation of 31 U.S.C. § 3729(a)(1)(A).  Additionally, defendants have knowingly caused to be used false records or statements to get false or fraudulent claims paid by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).  Defendants have also conspired to commit violations of the False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)C).  Further, defendants have knowingly avoided the obligation to repay these sums to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

58.    As a result of such violations of the False Claims Act, Defendants have caused wrongful payments to be made from the United States Treasury.  All of this has resulted in damage to the United States.

## X.  PRAYER FOR RELIEF

WHEREFORE, *qui tam* plaintiff prays for relief as follows:

*Qui Tam* Plaintiff's Complaint

1.      For three times the dollar amount shown to have been wrongfully charged to and paid by the United States;

2.      For maximum civil penalties for all false records, statements, certifications and claims submitted to the United States and the State of California, subject to being consistent with the Excessive Fines and Penalties Clause of the Eighth Amendment to United States Constitution;

3.      For the maximum statutory *qui tam* share of the recovery obtained for the United States;

4.      For all other damages allowed under law, including litigation expenses and reasonable attorneys' fees; and

5.      For such other and further relief as the court deems just and proper.

## JURY DEMAND

*Qui Tam* Plaintiff hereby demands trial by jury.


Dated:   July 30, 2014      Respectfully submitted,


Donald R. Warren
Attorney for *Qui Tam* Plaintiff James Dibdin, M.D.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

United States of America and James Dibdin, M.D.

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Medi-Lab Corporation, LFPS, Inc.; Pogosyan Corporation; Khachatur Pogosyan; Felix Koltsov; Davin Deb and Vardouhi Achabanian

**(b) County of Residence of First Listed Plaintiff** _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**County of Residence of First Listed Defendant**   Los Angeles County
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c) Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

Warren - Benson Law Group, 7825 Fay Ave., Ste. 200, La Jolla, CA 92037.
Phone: 858.454.2877

**Attorneys** *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff
☐ 2. U.S. Government Defendant
☐ 3. Federal Question (U.S. Government Not a Party)
☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☒ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT:** $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

31 U.S.C. sec 3729, et seq. Violations of the Federal False Claims Act.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☒ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number: **LA CV14 06007 -FMO ( PLAx)**

CV-71 (06/14)

**CIVIL COVER SHEET**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes ☐ No | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.? *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes ☐ No | | ☐ NO. Continue to Question B.2. |
| If "no," skip to Question C. If "yes," answer Question B.1, at right. | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.? *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes ☐ No | | ☐ NO. Continue to Question C.2. |
| If "no," skip to Question D. If "yes," answer Question C.1, at right. | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | **A.** Orange County | **B.** Riverside or San Bernardino County | **C.** Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |

| **D.1. Is there at least one answer in Column A?** | **D.2. Is there at least one answer in Column B?** |
|---|---|
| ☐ Yes ☐ No | ☐ Yes ☐ No |
| If "yes," your case will initially be assigned to the SOUTHERN DIVISION. | If "yes," your case will initially be assigned to the EASTERN DIVISION. |
| Enter "Southern" in response to Question E, below, and continue from there. | Enter "Eastern" in response to Question E, below. |
| If "no," go to question D2 to the right. → | If "no," your case will be assigned to the WESTERN DIVISION. |
| | Enter "Western" in response to Question E, below. ↓ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: → | |

| QUESTION F: Northern Counties? |
|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? ☐ Yes ☐ No |

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES**: Has this action been previously filed **in this court**?  ☐ NO  ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES**: Is this case related (as defined below) to any cases previously filed **in this court**?  ☐ NO  ☐ YES

If yes, list case number(s): _____

Civil cases are related when they:

☐ A. Arise from the same or closely related transactions, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Check all boxes that apply. That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):** _____ DATE: _____

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |